**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

| | | |
|---|---|---|
| In re | : | **OPINION AND** |
| | : | **ORDER** |
| **CALPINE CORPORATION, et al.,** | : | |
| | : | **Chapter 11** |
| Debtors, | : | No. 05-60200 |
| | : | **Jointly Administered** |

------------------------------------------------------------X

| | | |
|---|---|---|
| **NEVADA POWER COMPANY,** | : | |
| | : | |
| Defendant-Appellant, | : | **Adversary Proceeding** |
| | : | **No. 06-1683** |
| - against - | : | |
| | : | **06 Civ/3745 (SAS)** |
| **CALPINE CORPORATION, et al.** | : | |
| | : | |
| Plaintiffs-Appellees. | : | |

------------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

This bankruptcy appeal arises out of an adversary proceeding by

Calpine Corporation ("Calpine") and several of its affiliates (collectively, the

"Debtors") against Nevada Power Company ("Nevada Power").  Debtors moved

for an order extending the automatic stay pursuant to section 362 of the

Bankruptcy Code (the "Code") to a civil proceeding pending in the District of

Nevada, *Nevada Power Company v. Calpine Corporation, Moapa Energy Center,*

*LLC, Fireman's Insurance Company, and Does I-X* (the "Nevada Power

litigation"), as to co-defendant Fireman's Fund Insurance Company ("Fireman's"),

or, in the alternative, to enjoin the proceeding pursuant to section 105 of the Code.
In a memorandum decision and related order, the Bankruptcy Court granted the
Debtors' motion on both grounds.[1]  Nevada Power appeals to this Court.  For the
following reasons, the Bankruptcy Court's order staying the Nevada Power
litigation is affirmed.

## I.   BACKGROUND

### A.   Facts

Nevada Power provides electricity for most of the residents of the
State of Nevada.  It is a regulated public utility subject to the jurisdiction of the
Federal Energy Regulatory Commission ("FERC") and the Public Utilities
Commission of Nevada ("NPUC").  Pursuant to a FERC order issued in 1996 (the
"FERC Order"), Nevada Power was required to expand its transmission system's
capacity to accommodate requests for transmission service received from eligible
purchasers and sellers of energy, provided that such customers agreed to
compensate Nevada Power for the costs associated with the expansion by
contracting for transmission service from Nevada Power for an extended period of
time.  The group of eligible purchasers and sellers includes Calpine, a merchant

---

[1]      *See* Bankruptcy Court's October 30, 2006 Memorandum Decision
Staying Litigation (A860-A869) ("Bankr. Op.").

energy provider, which produces energy at its own facilities but relies on others to transmit the energy in interstate commerce. The FERC Order required Calpine to pay directly for the costs of expansions that are undertaken for Calpine's benefit. The FERC Order also authorized Nevada Power to demand that Calpine provide credit support for its obligations under the Order to protect Nevada Power against the risk of non-payment.

In accordance with the FERC Order, Nevada Power adopted an Open Access Transmission Tariff ("OATT"). This provision was filed with and approved by FERC and thus, has the force of law. The OATT provides that Nevada Power may require that a merchant energy marketer (such as Calpine) post a letter of credit or other form of guaranty that would protect Nevada Power against the risk of non-performance or non-payment.

Nevada Power is currently constructing a three-hundred million dollar electric transmission expansion project known as the Centennial Project in Nevada. Calpine's subsidiary, Moapa Energy Center LLC ("Moapa"), was to build a new generating plant, which was one of the plants for which the Centennial Project was being constructed. As authorized by the FERC Order, Nevada Power and Calpine entered into two Transmission Service Agreements ("TSAs") by which Calpine agreed to utilize the newly constructed power lines for twenty-five

-3-

years, thereby assuring payment to Nevada Power for the costs of construction.[2]

Each TSA required Calpine to post security to guarantee its obligations to Nevada

Power.

Various disputes arose during the construction of the Centennial

Project among Nevada Power, Calpine and other power generators concerning the

extent to which each generator should be required to bear a portion of the costs of

the project. A global settlement was reached in which each generator, including

Calpine, agreed to the proportion of total costs of the Centennial Project that

would be attributable to each generator, as well as the amount of security that

Nevada Power could demand each generator to post in connection with the

construction to guarantee performance and assure payment. FERC approved the

settlement as being in the best interests of the public.[3]

Under the settlement agreement, Calpine agreed that the costs of the

project attributable to it and the resulting security that could be demanded by

Nevada Power amounted to $33.33 million. Nevada Power and Calpine agreed to

---

[2]     One agreement was for 500 megawatts of transmission service (the
"500 MW TSA") and the other agreement was for 400 megawatts of transmission
service (the "400 MW TSA").

[3]     *See* Letter Order, *Nevada Power Co.*, 99 FERC ¶ 61,301 (2002)
(A57-A58).

terminate the 500 MW TSA and that Calpine would continue to maintain as security for its obligations under the 400 MW TSA a surety bond previously issued on July 18, 2001 by Fireman's in the amount of $33 million (the "Bond"). Under the terms of the Bond, Fireman's is jointly and severally liable to Nevada Power for Calpine's performance and payment obligations under the 400 MW TSA.

In October 2003, Calpine informed the NPUC that if Nevada Power did not agree to purchase all or substantially all of the output from Calpine's plant, Calpine would terminate the 400 MW TSA. Nevada Power did not agree to do so. Rather, on March 15, 2004, Nevada Power filed a petition with FERC requesting a declaratory order that under the 400 MW TSA and Nevada Power's OATT, Calpine was not permitted to terminate unilaterally the 400 MW TSA.

The Bond by its terms was set to expire on May 1, 2004. Despite Nevada Power's demands in April 2004, Calpine did not seek to extend or replace the Bond. On April 23, 2004, Nevada Power made a demand on Fireman's, notifying it that Calpine had repudiated its obligations under the 400 MW TSA. On April 27, 2004, Nevada Power made a second demand on Fireman's and reasserted Calpine's default under the 400 MW TSA. The Bond expired on May 1, 2004, and no further security was obtained by Calpine to secure Calpine's

-5-

obligations under the 400 MW TSA.

On November 19, 2004, FERC issued an order declaring that Calpine did not have the right to terminate unilaterally the 400 MW TSA. On November 22, 2004, Calpine notified Nevada Power by letter that Calpine would not be performing and was cancelling its obligations under the 400 MW TSA, in part due to Nevada Power's failure to enter into a power purchase agreement.

### B.    Procedural History

On May 12, 2004, Fireman's filed a civil action against Nevada Power in Nevada state court seeking declaratory judgment of no liability under the Bond, alleging that no default occurred during the term of the Bond. That action was dismissed on September 3, 2004 for lack of personal jurisdiction over Nevada Power.

On September 30, 2004, Nevada Power filed the Nevada Power litigation against Calpine, Moapa and Fireman's in Nevada state court seeking damages for breach of contract, breach of good faith and fair dealing, specific performance and declaratory relief. At the time the civil proceeding was commenced, Nevada Power had expended approximately $160 million on the Centennial Project. Fireman's removed the action to the United States District Court for the District of Nevada. Fireman's then moved to dismiss the complaint

-6-

and the court granted the motion.  Nevada Power subsequently made motions to

amend the complaint and for reconsideration, both of which were granted.  On

February 10, 2006, Fireman's filed a motion to dismiss the amended complaint

and subsequently moved for a stay of the action pending resolution of the motion

to dismiss.  On June 1, 2006, the court denied Fireman's motion to dismiss and set

the case for trial.  Fireman's filed its answer and a scheduling order was issued

later that month.

Previously, on December 20 and 21, 2005, Debtors filed voluntary

petitions under chapter 11 of the Code in the Bankruptcy Court for the Southern

District of New York, which were thereafter consolidated.  Nevada Power filed a

proof of claim against Calpine in the amount of $33 million.  Fireman's also filed

proofs of claim against several Calpine debtors for $33 million, the amount of

Fireman's potential liability on the Bond.

On August 4, 2006, Calpine instituted an adversary proceeding in the

Bankruptcy Court, moving to enjoin the Nevada Power litigation from proceeding

against Fireman's.  The Official Committee of Unsecured Creditors of Calpine

(the "Committee") and Fireman's moved to intervene, and both motions were

granted.  On October 25, 2006, in a memorandum decision, the Bankruptcy Court

granted Calpine's motion, and on October 31, 2006, the Bankruptcy Court issued

an order staying the Nevada Power litigation.

## II.    LEGAL STANDARD

### A.    Appeals of Bankruptcy Court Orders

#### 1.    Final Order

The district courts are vested with appellate jurisdiction over bankruptcy court rulings.[4]  Final orders of the bankruptcy court may be appealed to the district court as of right.[5]  An order is final if "[n]othing in the order . . . indicates any anticipation that the decision will be reconsidered."[6]  This Court has jurisdiction over the appeal irrespective of whether the injunction was issued under section 362 or section 105.  "If issued under Section 362, [this Court] would have jurisdiction on the ground that the automatic stay is analogous to a permanent injunction."[7]  "If issued under Section 105, the order would be appealable as a 'final injunction of limited duration.'"[8]

---

[4]     *See* 28 U.S.C. § 158(a).

[5]     *See id.* § 158(a)(1).

[6]     *In re Palm Coast, Matanza Shores Ltd. P'Ship*, 101 F.3d 253, 256 (2d Cir. 1996).

[7]     *In re Lomas Fin. Corp.*, 932 F.2d 147, 151 (2d Cir. 1991).

[8]     *Id.* (quoting *Manning v. Energy Conversion Devices, Inc.*, 833 F.2d 1096, 1101 (2d Cir. 1987)).

-8-

## 2.   Standard of Review

A district court functions as an appellate court in reviewing

judgments rendered by bankruptcy courts.[9]  Findings of fact are reviewed for clear

error.[10]  A finding of fact is clearly erroneous if the court is "'left with the definite

and firm conviction that a mistake has been committed.'"[11]  A bankruptcy court's

conclusions of law, by contrast, are reviewed de novo.[12]  The decision to grant or

deny an injunction is reviewed for an abuse of discretion.[13]

---

[9]      *See In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir. 1993)
("[Appellant] relies on several cases for the reasonable proposition that the district
court acts as an appellate court in reviewing a bankruptcy court's judgments.").

[10]      *See* Fed. R. Bankr. P. 8013 ("Findings of fact . . . shall not be set
aside unless clearly erroneous, and due regard shall be given to the opportunity of
the bankruptcy court to judge the credibility of the witnesses."). *Accord In re
Cody, Inc.*, 338 F.3d 89, 94 (2d Cir. 2003).

[11]      *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir.
1990) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395
(1948)).

[12]      *See In re Cody*, 338 F.3d at 94; *In re 139-141 Owners Corp.*, 313
B.R. 364, 367 (S.D.N.Y. 2004).

[13]      *See In re Chateaugay Corp.*, 109 B.R. 613, 621 (S.D.N.Y. 1990)
(reviewing a bankruptcy court's injunction of a non-debtor litigation for abuse of
discretion). *See also Hawaii Structural Ironworkers Pension Trust Fund v.
Calpine Corp., Inc.*, No. 06-5358, 2006 WL 3755175, at *4 (S.D.N.Y. Dec. 20,
2006) (same) (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*,
339 F.3d 101, 108 (2d Cir. 2003)).

## B.     Automatic Stays Under Section 362

"The filing of a Chapter 11 bankruptcy petition triggers an automatic stay of any judicial proceeding or other act against the property of the estate that was or could have been commenced before the filing of the petition" pursuant to section 362(a) of the Code.[14]  By its terms, section 362 applies only to debtors, property of the debtor, or property of the estate, and does not apply to stay proceedings against non-debtors.  In *A.H. Robins Co. v. Piccinin*, however, the Fourth Circuit held that section 362 could be extended to enjoin civil proceedings against non-debtors in "unusual circumstances."[15]  Likewise, in *Queenie Ltd. v. Nygard International*, the Second Circuit held that "the automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate."[16]  The examples of immediate adverse effect listed by the court involved (1) a claim against a non-debtor for an obligation for which the debtor was a guarantor, (2) a

---

[14]      *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 90 (2d Cir. 2003).

[15]      788 F.2d 994, 999 (4th Cir. 1986).

[16]      321 F.3d 282, 287 (2d Cir. 2003) (affirming the stay as to one of the nondebtors — the debtor's wholly owned corporation — but reversing the stay as to the other nondebtor).

-10-

claim against a debtor's insurer, and (3) "actions where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'"[17]

Two years after deciding *A.H. Robins*, the Fourth Circuit retreated somewhat and held that the stay should not be applied to actions against a surety or guarantor of the debtor.[18]  While the Second Circuit has never explicitly addressed this issue, various courts within this Circuit have held that section 362 should not be extended to stay non-debtor actions involving sureties or guarantors of the debtor.[19]  I will not address whether the section 362 stay was properly

---

[17]     *Id.* at 287-88 (quoting *A.H. Robins*, 788 F.2d at 999).

[18]     *See Credit Alliance Corp. v. Williams*, 851 F.2d 119 (4th Cir. 1988). In that case, unlike here, the liability of the debtor on the underlying debt had already been established by a default judgment; *i.e.*, the liability would not have been litigated in the action against the guarantor of the debt.  In such cases, the proceeding against the non-debtor surety or guarantor would not involve the debtor to the extent it would if liability had not yet been established.

[19]     *See, e.g., Longview Equity Fund, LP v. McAndrew*, No. 06 Civ. 4304, 2007 WL 186769, at *6 (S.D.N.Y. Jan. 23, 2007) ("'[A] Section 362 stay is not ordinarily extended to entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the Chapter 11 debtor.'" (quoting *CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31, 32 (S.D.N.Y. 1990))); *Am-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.*, 33 F. Supp. 2d 235, 242 (S.D.N.Y. 1998) ("'Section 362(a) does not stay actions against guarantors or sureties.'" (quoting *Advanced Ribbons & Office Prods., Inc.*, 125 B.R. 259, 263

-11-

ordered in this case because the Bankruptcy Court's grant of a stay under section

105 is affirmed.[20]

## C.    Injunctions Under Section 105

Section 105 of the Code states that "the court may issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of

_____

(B.A.P. 9th Cir. 1991))); *Federal Deposit Ins. Corp. v. Shea & Gould*, No. 95 Civ. 5491, 1997 WL 401822, at *12-13 (S.D.N.Y. July 17, 1997) ("'It is universally acknowledged that an automatic stay of proceeding accorded by § 362 may not be invoked by [or on behalf of] entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the Chapter 11 debtor.'" (quoting *Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194, 1196 (6th Cir. 1983))).

[20]    Courts consistently have found that section 105 may be used to stay actions against non-debtors even where section 362 otherwise would not provide such relief, recognizing that section 105 grants broader authority than section 362. *See, e.g.*, *Queenie*, 321 F.3d at 288; *In re Lomas*, 932 F.2d at 149; *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985). The Second Circuit's recent decision in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), is not to the contrary. There, the court stated: "[S]ection 105(a) does not allow the bankruptcy court 'to create substantive rights that are otherwise unavailable under applicable law.' Any 'power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code.'" *Id.* at 142 (citations omitted). The court in *In re Metromedia*, however, made that statement in the context of whether non-debtor releases — which were of particular concern to the court due to the potential for abuse — properly could be granted under section 105. Nothing in the court's opinion affects the longstanding practice of courts utilizing section 105 to stay (as opposed to release) non-debtor litigation when the circumstances justify such relief. Indeed, the court did not even refer to *Queenie* or any other non-debtor stay cases in its analysis.

-12-

this title."[21]  Under certain circumstances, a bankruptcy court has discretion to

enjoin a civil proceeding against a non-debtor under section 105.[22]  "A request by

a debtor for an injunction under section 105(a) pending confirmation of the

debtor's plans for reorganization is regarded as a request for a preliminary

injunction."[23]  Although the Second Circuit has declined to enunciate an explicit

test for when an injunction should issue,[24] courts have applied the "traditional

preliminary injunction standard as modified to fit the bankruptcy context."[25]  Thus,

in the bankruptcy context, the court should evaluate the following factors:  (1)

whether there is a likelihood of successful reorganization; (2) whether there is an

imminent irreparable harm to the estate in the absence of an injunction; (3)

whether the balance of harms tips in favor of the moving party; and (4) whether

---

[21]     11 U.S.C. § 105(a).

[22]     *See, e.g.*, *Queenie*, 321 F.3d at 288; *In re Lomas*, 932 F.2d at 149.

[23]     *Hawaii Structural*, 2006 WL 3755175, at *4.

[24]     *See Teachers Ins. & Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986) ("[W]e decline to define under what circumstances, if any, a bankruptcy court may properly exercise § 105 jurisdiction to issue a stay with respect to non-bankrupt co-defendants . . . .").

[25]     *Hawaii Structual*, 2006 WL 3755175, at *4 (citing 2 Collier on Bankruptcy ¶ 105.02 (15th ed. 2006)).

the public interest weighs in favor of an injunction.[26]  In evaluating these factors,

the court takes a "flexible approach and no one factor is determinative."[27]

As the Bankruptcy Court noted, there is a limited exception to the

imminent irreparable harm requirement that permits the court to issue a

"preliminary injunction in the bankruptcy context where the action to be enjoined

is one that threatens the reorganization process."[28]  However, "[e]ven under this

narrow exception, the threat to the reorganization process must be imminent,

substantial and irreparable."[29]

## III.   DISCUSSION

After reviewing the entire record, I conclude that the Bankruptcy

Court did not make or rely on any clearly erroneous findings and that it did not

abuse its discretion in weighing the injunction factors and granting the stay under

section 105.

---

[26]      *See id.  See also In re United Health Care*, 210 B.R. 228 (S.D.N.Y.
1997).  The parties agree that this modified preliminary injunction standard should
apply.

[27]      *Hawaii Structual*, 2006 WL 3755175, at *4 (citing *In re Eagle-Picher
Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992)).

[28]      Bankr. Op. at 5-6 (citing *Alert Holdings, Inc. v. Interstate Protective
Servs., Inc.*, 148 B.R. 194, 199 (Bankr. S.D.N.Y. 1992)).  *Accord Hawaii
Structural*, 2006 WL 3755175, at *4.

[29]      *Hawaii Structural*, 2006 WL 3755175, at *4.

-14-

### A.   Likelihood of Successful Reorganization

As the Bankruptcy Court observed, "[t]here is really no dispute that there is a strong likelihood that the Debtors can successfully reorganize."[30] Indeed, another court in this district has confirmed that observation in a recent appeal of a different adversary proceeding involving the same Debtors.[31]

### B.   Irreparable Harm

The Bankruptcy Court found that Calpine would suffer three separate irreparable harms in the absence of a stay of the Nevada Power litigation against Fireman's:  (1) the "risk of collateral estoppel and evidentiary prejudice" against Calpine; (2) "a drain on its estate due to its indemnification obligations to Fireman's"; and (3) "a significant burden and distraction of key employees from its restructuring efforts."[32]  Because I find that the Bankruptcy Court's finding of irreparable harm on the third harm, namely the burden and distraction of the restructuring effort, is not clearly erroneous, I need not address Nevada Power's contention that the remaining two irreparable harms are, as a matter of law,

---

[30]     Bankr. Op. at 9.

[31]     *See Hawaii Structural*, 2006 WL 3755175, at *6 (stating that Calpine is "likely to be successful in its reorganization efforts").

[32]     Bankr. Op. at 9.

insufficient to constitute irreparable harm.[33]

   The Bankruptcy Court reviewed the parties' submissions and held a hearing regarding the imminent irreparable harm that Calpine would suffer in the absence of a stay.  Kris Zadlo was Calpine's witness.[34]  A brief summary of Zadlo's testimony[35] and the record on this issue provides the framework for this Court's conclusion that the Bankruptcy Court's finding of irreparable harm is not clearly erroneous.

   Zadlo is the Director of Transmission Management responsible for managing the Transmission Operations Group at Calpine.[36]  Before Calpine

---

  [33] *See Hawaii Structural*, 2006 WL 3755175, at *4 ("Because the decision of the Bankruptcy Court is well supported by other threats to reorganization posed by the continuation of the [non-debtor litigation], I need not decide whether Calpine faces a risk of collateral estoppel sufficient on its own to warrant issuance of an injunction under section 105(a)."). Nevada Power conceded at oral argument that the Bankruptcy Court's finding that Calpine would suffer irreparable harm could not be disturbed if any one of the three separate irreparable harms were affirmed. *See* Transcript of Oral Argument dated March 15, 2006 ("Tr."), at 9 (Counsel for Nevada Power: "You only need one irreparable injury.").

  [34] Nevada Power's untimely objections to Zadlo's competence to testify are overruled.

  [35] The Bankruptcy Court admitted Zadlo's declaration as his direct testimony at the hearing on the stay.  He was cross-examined in person at that hearing.

  [36] *See* Declaration of Kris Zadlo in Support of Debtors' Motion to Extend the Automatic Stay or, in the Alternative, for Injunctive Relief, dated

entered into bankruptcy, the Transmission Operations Group had fifteen members

across three subgroups (five transmission engineers acting as Directors in the

Transmission Management Group, five transmission engineers in the Transmission

Analysis Group, and five non-engineer employees in the Transmission Market

Services Group).[37]  Since the bankruptcy, the Transmission Operations Group has

dwindled to three employees, including Zadlo.[38]  Zadlo is the sole remaining

Transmission Director and the only transmission engineer, and will remain as such

for the foreseeable future due to difficulties in retaining and training new

transmission engineers.[39]  Thus, Zadlo is currently responsible for the work of the

five directors who formerly comprised the Transmission Management Group as

well as for the work of the five transmission engineers who formerly comprised

the Transmission Analysis Group.[40]

      Zadlo is also an "integral and indispensable member of the

---

October 6, 2006 (A789-A795) ("Zadlo Decl.") ¶¶ 2-3 (detailing the duties and
responsibilities of his position).

[37]    *See id.* ¶ 4.

[38]    *See id.* ¶ 11.

[39]    *See id.* ¶¶ 11-12.

[40]    *See id.* ¶ 13.

restructuring team at Calpine."[41]   He devotes thirty to forty percent of his twelve-hour work day "directly on restructuring issues."[42]   This work includes analysis and review of Calpine's transmission agreements and whether those agreements should be assumed or rejected in addition to negotiation of modifications to contracts that Calpine decides to sell or reject in order to mitigate exposure.[43]   Zadlo also provides analysis of transmission operations and participates in meetings and discussions in order to provide the necessary assistance in strategic decision-making sessions for the restructuring effort.[44]   "[N]obody else" at Calpine other than Zadlo can provide such analysis of those technical transmission matters.[45]

Zadlo has and will be involved in the Nevada Power litigation.  He testified that he has already participated, along with three other Transmission Directors (who no longer work for Calpine), in review of sixty binders of

---

[41]     *Id.* ¶ 16.

[42]     *Id.* ¶ 14.

[43]     *See id.*

[44]     *See id.* ¶ 15.  Indeed, Calpine provides Zadlo with corporate housing during the week in order for him to be available for such meetings and discussions.  *See id.*

[45]     *Id.* ¶ 16.

documents that were produced by Nevada Power in the Nevada Power litigation against Fireman's.[46]  Such review was necessary due to the highly technical nature of the documents, which could not be deciphered by a lay person (or a lawyer) at either Calpine or Fireman's.[47]  Discovery is not complete in the Nevada Power litigation but rather has begun anew and will continue but for the stay that is the subject of this appeal.[48]  Zadlo, in his direct testimony, also outlined several factual issues in the Nevada Power litigation that would likely result in Fireman's calling upon Calpine to provide technical analysis, the responsibility for which, by default, would fall on Zadlo.[49]

Fireman's corroborated Zadlo's testimony.  Trial counsel for Fireman's, Marilyn Klinger, testified in her declaration submitted to the Bankruptcy Court that Fireman's would require the assistance of Calpine and discovery from Calpine in order to address the underlying factual issues in the dispute.[50]  But even without the testimony of the assistance Fireman's would seek,

---

[46]     See id. ¶ 17.

[47]     See id. ¶¶ 17-20.

[48]     See Tr. at 45.

[49]     See Zadlo Decl. ¶¶ 21-24.

[50]     See Declaration of Marilyn Klinger Provided in Connection with Debtors' Motion to Extend the Automatic Stay or, in the Alternative, for

a prudent debtor would exercise its business judgment and assist in any way possible in Fireman's defense.  This is especially so in situations where the debtor's liability has not yet been established and where the surety has the ability to assert all of the debtor's factual and legal defenses to liability, and where the surety has no knowledge of the debtor's business or the underlying facts.[51]  As a result, the Bankruptcy Court's finding that "Fireman's cannot defend itself in the Nevada Litigation without the active and essential participation of Calpine through its key reorganization personnel"[52] was not clearly erroneous.

Zadlo testified that "[i]f the Nevada Power litigation proceeds, [he] will have to devote substantial time to conduct the required analysis during discovery and preparing for trial," and that any additional responsibilities resulting from his involvement in the Nevada Power litigation "would reduce the time [he] ha[s] to focus on the restructuring activities as well as Calpine's business

Injunctive Relief (A799-A810) ¶¶ 23-26.

[51]     Thus, Nevada Power's argument that Calpine is not contractually or otherwise "required" to assist Fireman's is a *non sequitur*.  It cannot reasonably be disputed that it would be imprudent for Calpine to sit on the sidelines while its liability on a debt is being litigated, for which, if liability is established, Calpine will be required to indemnify Fireman's.

[52]     Bankr. Op. at 9.

operations."[53]  The Bankruptcy Court found, based on Zadlo's responsibilities in Calpine's day-to-day operations as well as its restructuring effort and the burden on his time caused by the Nevada Power litigation, that Calpine would suffer irreparable harm in the absence of a stay.  There is sufficient evidence in the record that Zadlo is key to the restructuring and to the business and that both would suffer irreparable harm if he were distracted from his responsibilities in order to participate in the Nevada Power litigation.  The testimony elicited on cross examination that Zadlo did not have specific details of what would be required from him if the litigation were to proceed and that he had not yet been contacted by Fireman's to assist in its defense are not sufficient to overturn the Bankruptcy Court's finding of irreparable harm.

### C.    Balance of Harms

The Bankruptcy Court weighed the irreparable harm that Calpine stands to suffer in the absence of a stay against the harm Nevada Power claims that it would suffer if it were not permitted to proceed against Fireman's and found that the "balance of the equities weigh decisively in Calpine's favor."[54]  I cannot conclude on this record that the court's determination was clearly erroneous.

---

[53]    Zadlo Decl. ¶ 26.

[54]    Bankr. Op. at 10.

Nevada Power asserts that it will suffer harm if the litigation is stayed because it may be prohibited from requesting recovery through an increase in rates.  It argues that an increase in rates will not be permitted until the NPUC approves such request and that the NPUC will not approve any request until the liability on the debt is determined by a court.  According to Nevada Power, the next opportunity to raise rates is November 2008 and unless it can get approval by then, it will lose the right to recover forever because the NPUC does not permit retroactive recovery.

There are several problems with Nevada Power's position.  *First*, Nevada Power fails to explain why it must seek to recover through an increase in rates as opposed to going to the marketplace to cover its losses.[55]  As a result, it is unclear whether this purported harm is of Nevada Power's own making and whether it is irreparable.  *Second*, even if the litigation proceeds against Fireman's and Nevada Power sustains a loss, it is highly unlikely that the litigation would be completed by the end of 2007, and will probably extend well into 2008.  Thus, even in the absence of this stay, it is likely that Nevada Power would still not be able to seek a rate increase based on its loss and obtain approval from the NPUC

---

[55]     *See* Tr. at 67.

-22-

by the November 2008 deadline for rate increases.[56]    Accordingly, Nevada Power

may suffer this "harm" no matter what the outcome of the present appeal.

The only way that Nevada Power is certain to be better off in the

absence of a stay is if it prevails against Fireman's and thereby is able to obtain

recovery sooner rather than later.  The inability of Nevada Power to obtain a

hypothetical recovery[57] sooner rather than later, however, is not a harm — and is

certainly not an irreparable harm — sufficient to outweigh the irreparable harm

that Calpine will suffer if the Nevada Power litigation were permitted to proceed.

The Bankruptcy Court's finding that the balance of harms tips in favor of Calpine

is not clearly erroneous.

D.    **Public Interest**

Evaluation of the public interest factor of the analysis "requires a

balancing of the public interest in successful bankruptcy reorganizations with

---

[56]    Once a reorganization plan is proposed, which is estimated to be by
the end of June 2007, *see id.* at 47-48, Nevada Power will have an estimate of its
likely recovery against Calpine. *See id.* at 60-61.  Thus, Nevada Power would not
need to litigate its claims against Calpine before seeking a rate increase approval.

[57]    It should be noted that recovery against Fireman's is hardly a
foregone conclusion.  In addition to Calpine's defenses that Fireman's may assert,
Fireman's also may have a defense that the breach, if any, occurred after the Bond
had expired.

-23-

other competing societal interests."[58]  The analysis of the public interest factor in

this case is similar to the analysis of the balance of the harms.  On the one hand,

there is the public interest in protecting Calpine's ability to successfully

reorganize.  On the other hand, Nevada Power claims that there is a public interest

in protecting a public utility's right to recover on a debt.  However, Nevada Power

has not demonstrated that it will suffer any harm that could tip the scales so

strongly as to overturn the Bankruptcy Court's determination that the irreparable

harm to Calpine's reorganization process outweighed any other harm.

---

[58]      2 Collier on Bankruptcy ¶ 105.02[2].  *Accord Hawaii Structural*,
2006 WL 3755175, at *4 (citing *Tucker Anthony Realty Corp. v. Schlesinger*, 888
F.2d 969, 972 (2d Cir. 1989)).

-24-

## IV.   CONCLUSION

For the reasons discussed above, the Bankruptcy Court's order

staying the Nevada Power litigation pending in the District of Nevada is affirmed.

The Clerk of the Court is directed to close this appeal.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            March 28, 2007

-25-

## - Appearances -

**For Appellant Nevada Power Company:**

David R. Kuney, Esq.
Kurt H. Jacobs, Esq.
Valerie L. Leatherwood, Esq.
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

**For Appellees Debtors Calpine Corporation, et al.:**

Richard M. Cieri, Esq.
Kirkland & Ellis LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Jeffrey S. Powell, Esq.
Kirkland & Ellis LLP
655 15th Street, N.W.
Washington, D.C. 10022
(202) 879-5000

Mark E. McKane, Esq.
Kirkland & Ellis LLP
555 California Street
San Francisco, California 94104
(415) 439-1400

**For Fireman's Fund Insurance Company:**

D. Farrington Yates, Esq.
Sonnenschein, Nath & Rosenthal LLP
1221 Avenue of the Americas, 24th Floor

New York, New York 10020
(212) 768-6700

**For the Official Committee of Unsecured Creditors:**

Michael S. Stamer, Esq.
Philip C. Dublin, Esq.
Abid Qureshi, Esq.
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York 10022
(212) 872-1000